1

2

3

4

5

JUDGE ROBERT J. BRYAN

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9

10

11

12

13

| UNITED STATES OF AMERICA, | ) | NO. CR12-5412 |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT'S SENTENCING |
| vs. | ) | MEMORANDUM |
| | ) | |
| MICHAEL EDWARD MARTIN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

14

15

16

*[Michael Martin] was an outstanding Soldier with a tremendous amount of potential ... [He] won Soldier of the Month several times, Soldier of the Quarter several times, Division Soldier of the Quarter and runner up for the III Corp Soldier of the Quarter and 1st CAB Soldier of the Year, and runner up for Battalion Soldier of the Year, twice.*

17

— Captain Ryan Sweet, JAG Defense Counsel, writing about Mr. Martin in June of 2012[1]

18

19

20

*I believe [Michael Martin] to be a troubled but decent person who served his country for over 12 years including a combat tour. He admittedly made some poor decisions. He had a rough hand dealt to him as his twin sister died in a car accident, his mother became disabled, he lost a close friend in combat and his father died unexpectedly. Unit support or leadership was much less than what should be expected.*

21

— Captain Jerry Squires, Squadron Chaplain in June of 2012

22

23

*I regret that these events happened and am embarrassed by my actions.*

24

– *From Michael Martin's Letter to the Court*

25

_____

26

[1]Captain Sweet's and Captain Squires' memorandums accompany this memo as exhibits 1 and 2.

## I.  INTRODUCTION AND DEFENSE SENTENCING RECOMMENDATION

The Defense asks the Court to sentence Mr. Martin to the time he has already served.  He has been in custody for slightly more than a year.  This sentence is sufficient but not more than sufficient to meet the statutory requirements of sentencing.  Specifically, this sentence takes into account the seriousness of Mr. Martin's conduct, his commendable service to his country, his need for medical and mental health treatment, as well as sending a message to Mr. Martin and others, that taking the law into one's own hands, by threatening those we rely upon to enforce the law, cannot be tolerated in a civilized society.

The Defense takes issue the Presentence Report's (PSR) Guideline calculation.  Probation recommends the court impose two enhancements beyond the base offense level, for conduct evidencing more than two threats, and for conduct evidencing an intent to carry out the threat. As is discussed below, Mr. Martin admits to a single threat, and is accused of making a second threat.  Mr. Martin also argues that his conduct, all occurring before the threat was made, did not manifest an intent to follow through with the threat at the center of this case.

It is apparent that Mr. Martin's life has been on a downward spiral for some time.   Mr. Martin sought help while in the military to try to deal with deepening mental health issues. Suffering from anxiety, insomnia and depression he attempted to commit suicide, and engaged in behavior he knew was "not him."  In the past two years, the failure of his marriage, a disastrous romantic relationship, and increasing legal problems increased his anxiety and his frustration.  Despite seeking help, Mr. Martin watched his 12 year military career end in disgrace. His behavior resulted in his discharge from the Army.  He was charged for criminal behavior in the State.  Delays in transition from military health care to care provided by the Veteran's Administration meant Mr. Martin was not receiving treatment in the months leading up to this incident.

Mr. Martin's struggles with mental health issues do not excuse his behavior.  Over the past few years Mr. Martin has been his own worst enemy.  He has engaged in obsessive and

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**

self destructive behavior that allowed him to think that getting his way through threats was a reasonable course of action.  Mr. Martin now realizes his behavior was criminal, and knows he is only beginning the long road to getting the good part of himself back.  His arrest and time in custody has served as Mr. Martin's wake-up call telling him he must face his demons, whatever they are, before he can begin the rest of his life.

Mr. Martin admits his actions were inexcusable.  While, through this memo, he attempts to put his actions in context, he understands that nothing he can say makes his threats seem appropriate, or any less injurious.  Mr. Martin struggles to understand how he came to this place in his life and knows he faces a great deal of work in getting his life back.

## II.  MICHAEL EDWARD MARTIN

### A.   The Beginning.

In art, one definition of tragedy is a tale where a protagonist is brought to ruin by a fatal, internal, flaw.  Michael Martin's fall from grace over the past few years is the stuff of this kind of tragedy.

Mr. Martin grew up in Texas.  His dad was a career manager with Walmart.  Mr. Martin grew up in a loving family, but a family that struggled financially.  He remembers the family always had the necessities, but always had less than the others he went to school with.  A relatively "normal" lower middle class childhood ended with a moment of great tragedy when Mr. Martin was 18.  Melissa, Mr. Martin's twin sister, was killed in a car crash on Halloween night.  Mr. Martin was brought to the scene shortly after the accident, and then to where his sister's body was being processed.  The death of their daughter devastated Mr. Martin's parents.  Mr. Martin believes his father never really moved on from the tragedy, and his mother aged quickly in the years after the accident.  Mr. Martin would argue that he recovered from his loss, but later tragedy brought this moment of loss back to him.

Mr. Martin took the year after high school to collect himself before choosing to join the Army, where he would serve for the next 12 years.  Exhibits 3 and 5.  Mr. Martin joined the

DEFENDANT'S SENTENCING MEMORANDUM - 3
*United States v. Michael E. Martin / CR12-5412RJB*

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**

1   Army the year before September 11th; the peacetime Army that trained him was very different

2   from the Army of today.  The Army could be seen as much as a refuge as a noble career.

3        In the military, Mr. Martin was a decorated soldier who served honorably in the War on

4   Terror.  He first served, on and shortly after September 11, 2001, as an intelligence

5   interception officer stationed in the United States.  He was stationed at Fort Hood, Texas,

6   where he left the seemingly solid world of Texas every work day, for the virtual world of

7   intelligence analysis in the three countries he was assigned.  The virtual world became

8   frighteningly real the morning of September 11.  Mr. Martin describes the day as the longest

9   day of his life.  The military was desperate to discover evidence to support their belief that Al

10  Queda and Osama Bin Laden were behind the attacks.  Mr. Martin was part of that effort.  His

11  country intelligence load went from three to nine countries.  He, along with countless other

12  military intelligence personnel worked nearly nonstop to sift through the mountain of data

13  before him searching for nuggets in what had only days earlier been so much noise.

14       Mr. Martin's job instantly switched from peace keeping to preparing for war.  After his

15  assignment doing remote intelligence gathering, Mr. Martin was sent to Iraq to work on the

16  ground doing field intelligence.  He rose through the enlisted ranks and was promoted to

17  sergeant eligible for promotion.   He was decorated for his work, and his work was the kind of

18  military service that directly saves lives.

19       Iraq exposed Mr. Martin to the terrors of war.  His best friend was killed in combat.  His

20  unit routinely came under fire.  While soldiers are trained to do their duty in combat, nothing

21  can prepare them for living in combat.  Upon his return form Iraq, Mr. Martin confronted

22  post-combat reality.  This post combat reality exposed his "tragic flaw."  After Iraq, he found

23  it hard to sleep and life did not feel right.  He left intelligence work and sought training at

24  another military profession, petroleum distribution, hoping it would be less stressful.  He still

25  had trouble sleeping and trouble putting aside his war and intelligence experiences.  He had

26  medals, but not a very firm sense of where the ground was under his feet.

DEFENDANT'S SENTENCING MEMORANDUM - 4
*United States v. Michael E. Martin / CR12-5412RJB*

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**

Mr. Martin would tell you that war changed him, as it must change everyone who serves in a combat zone. He returned anxious about his intelligence work, fearful he would miss some instantly critical information, and unable to sleep from a combination of war memories and difficulty to adjustment coming back. He was diagnosed with adjustment disorder, a short term condition where experiences lead to anxiety and what might now be thought of as Post Traumatic Stress like feelings. Despite the length of time he suffered with adjustment symptoms, he was never formally diagnosed with PTSD.

Mr. Martin loved the Army. He did not love intelligence work anymore, though. While in retrospect it seems clear he was now badly suited to the stress of this work – he'd been doing it too long and had probably seen too much; to him it was simply that he was losing interest. He sought out alternative training and reenlisted to continue his military career. He was sent to Korea for a tour of duty. He liked Korea very much. Unfortunately, while in Korea, he was in a serious car accident from which he suffers chronic, though not debilitating, effects. When he returned to the United States he sought treatment that was not provided in Korea, and began a process of surgically repairing his injuries.

### B.   Things Fall Apart.

Michael's letters and notes to himself after Iraq show a struggle to deal with anxiety and depression. Years later, his return from duty in Korea, marked a period of accelerating descent, ending up where we are today. After Korea, Mr. Martin was transferred to Fort Lewis, to a unit already over strength. He had little purpose. He never fit in to his new unit, and his commanding officers never seemed to take to him. It is possible that his superiors' distance was based on something about Mr. Martin. His relationship with his wife collapsed, and nothing felt like it was going right. Mr. Martin sought help with military psychologists and began treatment for his adjustment difficulties. Mr. Martin admitted he was suicidal. His condition was serious enough that he was given permission by his usually unsympathetic superiors to leave his post to go seek help if necessary.

DEFENDANT'S SENTENCING MEMORANDUM - 5
*United States v. Michael E. Martin / CR12-5412RJB*

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**

Mr. Martin, suffering from Post Traumatic Stress, at the very least, began treatment through the military. He began the slow process of dealing with his insomnia and depression. He had taken to drinking alcohol by this time which offered some escape, but really only made things worse.

Mr. Martin and the Army have very different stories of events leading up to his eventual discharge. Mr. Martin believes he was singled out for mistreatment by his superiors in his new unit at Fort Lewis. Mr. Martin became convinced the Army was trying to set him up to get rid of him. The Army found Mr. Martin to be an unfit soldier who repeatedly disobeyed orders and acted in ways detrimental to the order required in the military. The truth lies somewhere in the middle, probably. Mr. Martin's erratic behavior did call him to the attention of his superiors and his own choices made things worse. The chaplain who counseled Mr. Martin reported that others had trouble with Mr. Martin's chain of command, and even reported that he felt Mr. Martin was followed by someone to counseling sessions.

Mr. Martin's time at Fort Lewis was, in a word, a disaster. After being disciplined for marijuana use, being found to be AWOL while attending his father's funeral, found to have threatened a soldier with whom he had a romantic relationship, and other violations, his superiors became increasingly intolerant of Mr. Martin's behavior. They seemed to believe he was a disruptive influence, and appeared to want him gone. The Army discharged Mr. Martin under less than honorable circumstances in early summer of 2012.

Mr. Martin's problems had only just begun. Once out of the military, he entered into the world of Veteran's Administration provided medical care. Mr. Martin applied for mental health treatment and was placed in line for processing. At the time he applied for benefits the waiting time was more than a year. He was never seen by the Veteran's Administration and has still not been advised whether he is eligible for care or other benefits. Mr. Martin has not been treated for his mental health problems since he left the military.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**

At the time he left the military, Mr. Martin was a mix of the good soldier he had been for so long, and a self destructive man.  Despite leaving the military under a dark cloud, Mr. Martin attempted to work toward some kind of future.  He signed up for post military college classes subsidized the VA.  He intended to study science.  This plan came to ruin when, while attending a class held on Ft. Lewis, he was arrested for trespassing.  Mr. Martin was told he could not enter the base based on previous threatening behavior.  While not charged in this incident, it became clear he could not attend classes the way he intended, and he withdrew from the University of Maryland Extension classes in which he had enrolled.

Mr. Martin left the military angry and unhappy.  He felt he had been poorly treated and became obsessed with getting back at those he viewed as having done him wrong.  Ultimately, he became threatening.  While still in the Army, Mr. Martin had a relationship with a young soldier he met on Fort Lewis.  The complicated story of this relationship is hard to discern because Mr. Martin and the woman have turned out to be hopelessly unreliable narrators.  What is clear is that the relationship ended with great commotion.  Both parties accused the other of harassment and threatening behavior.  Ultimately, Mr. Martin was accused of violating a Municipal Court order of protection for which he entered a plea to a deferred adjudication program.  Mr. Martin accused the woman with threatening him, as well.  The military prosecutors investigated these complaints and determined they would not file any criminal charges in the case.  The prosecutors advised Mr. Martin to contact the state authorities regarding his allegations.  Instead, Mr. Martin responded by sending an email to the military prosecutor threatening him.

At the time Mr. Martin threatened the military lawyer, he was deep into the obsessive work he was doing trying to undo all the wrongs he felt had been done to him.  He wrote a manifesto relating his mistreatment, intending to send it on to Congress and the White House.  This manifesto makes clear he believed he was being mistreated by the authorities.  What is unclear is how much of this perception is based on reality.  His appellate counsel's letter

DEFENDANT'S SENTENCING MEMORANDUM - 7
*United States v. Michael E. Martin / CR12-5412RJB*

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**

1  seeking leniency on his behalf makes it clear that Mr. Martin was having a hard time and that,

2  at least from Mr. Martin's perspective, he was being mistreated.  This perception gives

3  context for Mr. Martin's actions: his world was falling apart and he was receiving little help,

4  but does not make clear how much of Mr. Martin's downfall was his own doing.

### III.  GUIDELINE CALCULATION

6  The Defense disagrees with the PSR's Guideline calculation.  Paragraphs 14-24.  While

7  Probation concludes Mr. Martin's adjusted offense level to be 17, The Defense believes

8  Probation's requested enhancements are not supported by a preponderance of the evidence,

9  and that his offense level is 10 after acceptance of responsibility.  This would produce a

10  guideline range of 6-12 months.

11  United States Sentencing Guideline § 2A6.1. Threatening or Harassing Communications .

12  . ., reads in part:

13  **(a)** Base Offense Level

14  **(1)** 12; or

15  **(2)** 6, if the defendant is convicted of an offense under 47 U.S.C.§ 223(a)(1) (C), (D),
or (E) that did not involve a threat to injure a person or property.

16

17  **(b)** Specific Offense Characteristics

18  **(1)** If the offense involved any conduct evidencing an intent to carry out such threat,
increase by 6 levels.

19  **(2)** If (A) the offense involved more than two threats;

20  In its draft Presentence Report the Probation office calculated the Sentencing Guideline

21  Range as follows:

22  • A base offense level of 12.

23  • 2 points added for multiple threats or victims.

24  • 2 points credit for acceptance of responsibility.

25  Resulting in an adjusted offense level of 12.  Mr. Martin has no criminal history.  Based on

26  this calculation, the Guideline Range would be 10-16 months.

DEFENDANT'S SENTENCING MEMORANDUM - 8
*United States v. Michael E. Martin / CR12-5412RJB*

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**

In its final draft, probation added 6 additional points for "conduct evidencing an intent to carry out the threat."  Based on this higher offense level, Mr. Martin is due 3 points off for acceptance of responsibility.  This new calculation results in a Guideline Range of 24-30 months, or nearly double the original range promoted by Probation.  Mr. Martin believes that none of Probation's proposed enhancements are due Mr. Martin.  Mr. Martin believes that the even the draft PSR range is incorrect.  The final draft of the PSR states that "objections" from the government received after the preparation of the draft were incorporated into the final PSR.  The Defense was not provided these "objections" prior to receiving the final PSR.

A.   **Mr. Martin Admitted to Making Only One Threat and May Have Made a Second, Insufficient to Apply the Enhancement for Making "More Than Two Threats."**

The Guidelines apply a two level enhancement to the base offense level "If [] the offense involved more than two threats."  The PSR misstates this rule by stating the enhancement is due for *two or more threats."*  PSR at 17.  The Guideline is ambiguous as to whether the enhancement applies to situations where it can be argued more than one person was arguably included in a single threat.  In this case Mr. Martin admitted to one threat and is accused of making another.  In this case, Mr. Martin admitted to making the single threat contained in the plea statement.   Probation also references an incident where Mr. Martin allegedly posted an angry comment on Facebook after he was arrested while on JBLM attending school.  Mr. Martin was angry because he had been told he could enter the base to attend college classes in which he was already enrolled.  Assuming this comment is a threat, and that Mr. Martin posted the comment, it is only a second threat.

B.   **Mr. Martin Evidenced No Intent to Carry Out His Threat and is Not Due the Guidelines 6 Level Enhancement.**

There is insufficient evidence to apply the Guidelines 6 level enhancement for "conduct evidencing an intent to carry out such threat." The enhancement is not to be liberally applied, it is intended to punish clear evidence of intent:

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**

The commentary to U.S.S.G. § 2A6. 1 states: "These statutes cover a wide range of conduct, the seriousness of which depends upon the defendant's intent and the likelihood that the defendant would carry out the threat. The specific offense characteristics are intended to distinguish such cases." U.S.S.G. § 2A6. 1, comment. (backg'd). The purpose of the enhancement is clear: Defendants who act on their threats are more dangerous, and therefore, deserve more punishment. The critical issue should not be the timing of the conduct, but whether the conduct shows the defendant's intent and likelihood to carry out the threats.

*United States* v. Hines, 26 F.3d 1469, 1474 (Cir. 9)(1994)(In discussing the element of timing of conduct in application of the Guideline).  Thus, the enhancement is intended to punish those with a clear intent to carry out their threat, and should not be applied to others less culpable who, for instance,  may have only an arguable ability to carry out a threat.  Mr. Hines, for example, stole a gun and traveled to Washington D. C., to kill President Bush.  *Id.*

 The intent enhancement contained in the final draft appears to be based on information contained in paragraph 10 of the PSR.  The information contained in that paragraph does not relate to the threat made in this case.  It does not prove Mr. Martin had any intent to carry out this threat.  Probation claims that GPS information contained on Mr. Martin's phone indicated he had visited the residences of others he was upset with.  The report also says Mr. Martin possessed a chemistry set and sulfuric acid, in the form of battery acid, found during a search related to Mr. Martin's arrest.

The Defense is not aware of any true GPS data in this case.  The Government did provide cell phone information in this case, but that information contained cell phone tower location rather information and not satellite based phone location data.  Lacking expert testimony to the contrary, the Defense believes the cell phone information is not precise enough to place the cell phone at a particular location, but merely indicates the location of the cell the phone was using at a moment in time.  Any opinion as to the meaning of this cell data is conclusory and unreliable.  Mr. Martin believes that this information merely places him in a particular area (usually in Olympia, near where he lived) but is not capable of pinpointing an exact location.  At the very least the statement in the PSR misstates what can be shown by the phone

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**

1    data.  There is no basis to conclude from this information that Mr. Martin intended to carry

2    out the threat at issue in this case.

3        It is important to note that none of the alleged threats in this case mention chemicals or

4    acid.  Nothing in the PSR indicates that the dilute sulfuric acid, or anything in the chemical

5    set, was so dangerous that its simple possession indicated intent to kill.  It should be noted

6    that, while not issue determinative,  Mr. Martin possessed at least the chemistry set, for

7    example, long before the date of threat and for a legitimate purpose.

8        Mr. Martin did possess the chemistry set.  It is a rudimentary highschool or college

9    chemistry class set.  This set was purchased as part of his participation in an extended learning

10   class presented by the University of Maryland.  Mr. Martin was forced to withdraw from this

11   class when he was told he could not enter Ft. Lewis to attend the class.  Mr. Martin also

12   agrees he possessed diluted sulfuric acid in the form of battery acid that is commonly used in

13   automobile batteries.   It is common to possess this form of acid and its possession does not

14   indicate an illegal intent.

15       The report also claims that Mr. Martin's computer and phone contained identifying

16   information derived from computer searches.  The use of this publicly available information is

17   only conjecture on the part of the Government and Probation.  It is not related to this threat.

18   There is insufficient evidence to conclude Mr. Martin had any intention of carrying out his

19   threat.

20       Because there is insufficient evidence to show that Mr. Martin had an intention to carry

21   out the threat contained in the plea statement, the Court should conclude the enhancement is

22   inappropriate in this case.

23       The PSR also tells the Court that Mr. Martin is the suspect in an assault on a judge in the

24   State of Washington.  He denies these charges, has not been convicted and are not relevant to

25   the determination of Mr. Martin's intentions in this case.

26

DEFENDANT'S SENTENCING MEMORANDUM - 11
*United States v. Michael E. Martin / CR12-5412RJB*

### III.  ARGUMENT IN SUPPORT OF A TIME SERVED CUSTODIAL SENTENCE

Michael Martin acted criminally when he threatened military prosecutors in order to get them to do what he wanted.  This is not all Mr. Martin is, however.  Mr. Martin's life has not been easy, but few lives are.  He still mourns the loss of his sister and the loss of friends in Iraq.  Up until the events culminating in Mr. Martin's threats, he was a good soldier.  He served honorably and with distinction.  Mr. Martin appears to suffer from mental health challenges – some diagnosed – some probably not. Exhibit 4.  He has received minimal mental health treatment and that treatment fell by the wayside when the Army discharged him and he fell into a gap between treatment providers.  It is impossible to know if adequate mental health treatment might have avoided us being here for a criminal sentencing, but it is possible.

Mr. Martin understands that his behavior was grossly inappropriate and knows he has work to do in order to begin fixing what is broken in him.  He accepts this challenge.

The Defense urges the Court to sentence Mr. Martin to time served, or a little over a year in custody.  This sentence is in the Guideline range as originally calculated by Probation.  The Defense also suggests the Court order Supervised Release with a requirement that Mr. Martin seek out mental health counseling.  As he has no resources, the Court should consider ordering the beginning of Supervised Release to be served in a halfway house.  Once Mr. Martin has his feet under him, he would like to return to Texas, basically to start over.  He knows he has a lot of hard work to do and that there may well be bumps, including his having to deal with legal issues in the State of Washington on the way.  He is ready to begin getting his life back.

Ultimately, this sentence appropriately punishes serious misconduct by a man who, up to this stretch of his life, was a good soldier, good son, and contributing member of society.  He has not dealt with adversity in an appropriate manner and now pays the price for his conduct.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**

Finally, having been charged with Assault in the First Degree in Washington State, Mr. Martin faces a long period of incarceration following his release from federal custody.  He will go directly to the State to raise a defense to the serious charges he faces there.

### IV.  SUMMARY AND CONCLUSIONS

Because of Mr. Martin's personal characteristics, the unusual facts of this case, and the Court's required consideration of statutory sentencing factors, the Defense submits that a sentence of time served, or a bit more than 12 months in custody, followed by Supervised Release, would be a sentence sufficient, but not greater than necessary, to punish Mike for his actions.

Accordingly, the Defense respectfully recommends that the Court adopt the above-stated sentencing recommendation.

DATED this 30th day of September, 2013.

Respectfully submitted,

s/*Jerome Kuh*
Jerome Kuh
Attorney for Michael E. Martin

DEFENDANT'S SENTENCING MEMORANDUM - 13
*United States v. Michael E. Martin / CR12-5412RJB*

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**

1

**CERTIFICATE OF SERVICE**

2     I hereby certify that on the date below, I filed with the Clerk of the Court the foregoing

3   Defendant's Sentencing Memorandum.  I used the CM/ECF system, which will send

4   notification of such filing to Ye-Ting Woo, the Assistant United States Attorney of record.

5     DATED this 30th day of September, 2013.

6

7                         *s/ Kathleen A. Gilkey*
                          Kathleen A. Gilkey

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT'S SENTENCING MEMORANDUM - 14
*United States v. Michael E. Martin / CR12-5412RJB*

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, Washington  98402**
**(253) 593-6710**